UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | No. 3:13-00082 Chief Judge Haynes |
| JOSUE CASTRO PINEDA, et al., | ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM**

The United States filed this action against the Defendants, Josue Castro Pineda, Raul Cedello Pena, and Ines Lopez Pena, who are charged with conspiracy to possess with the intent to distribute heroin and possession with the intent to distribute heroin.

Before the Court are motions to suppress filed by Defendants Ines Lopez Pena and Raul Cedello Pena (Docket Entry Nos. 52 and 54). Defendant Ines Pena Lopez moves to suppress certain evidence seized by the government pursuant to a search warrant and during his arrest on April 26, 2013 at 153 Ocala Drive, Antioch, Tennessee. Defendant Lopez seeks suppression of the 1.7 kilograms of heroin found in Ocala residence; the cocaine and heroin seized from his person and his vehicle and text messages from his cellular telephone. Both Defendants contend that the police officers who conducted these searches, lacked probable cause for the search warrant for the residence and for their searches of these Defendants. These Defendants, who are not fluent in English, argue that they did not knowingly waive their Miranda[1] rights and their post arrest statements to the

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966)

officers should be suppressed. In its response, the Government contests each contention.

The Court held an evidentiary hearing, and set forth below are the Court's review of the factual record and its conclusions of law.

**A. Review of the Record**

On February 1, 2013, officers with the Metro Nashville Police Department ("MNPD") conducted surveillance of the residence at 153 Ocala Drive in Nashville based upon an anonymous tip that heroin was being distributed from this residence. The officers also followed a vehicle that left this residence and observed the vehicle's occupants meet with occupants of a second vehicle at a Starbucks coffee shop at 5533 Edmondson Pike in Nashville, Tennessee. Based upon the anonymous tip and their observations, officers conducted a traffic stop of the second vehicle and an occupant told officers that he had just purchased seven grams of heroin from the occupants of the first vehicle whom the occupant identified as Reyes and Cordova. The officers then stopped the first vehicle in which Reyes and Cordova were occupants, but did not find any drugs.

Based on the results of the trash search, on April 25, 2013, the officers applied for and received a search warrant for 153 Ocala Drive that the officers executed on April 26, 2013. (Docket Entry No. 60-1 and 2). For the purposes of the Defendants' motions to suppress, the police officer's affidavit for the search warrant reads, in pertinent part:

> 2. In response to the information obtained detectives began to conduct surveillance on the residence. On February1, 2013, your affiant and other detectives with the South Precinct Crime Suppression Unit were conducting surveillance on the residence. Your affiant observed a blue Nissan Xterra bearing Tennessee license plate J6076B in the driveway of the residence. Two males exited the front door of the residence and entered the vehicle. The vehicle then pulled out of the driveway. The vehicle was followed by detectives to the parking lot of the Starbucks located at 5533 Edmondson Pike. Once the vehicle was parked into the parking lot, Detective Brandon Tennant observed a male white exit out of a gold Chevy Blazer, also parked

in the parking lot, walk over to the blue Nissan Xterra and enter the back seat on the passenger side. A short time later the same male white exited out of the blue Nissan Xterra and walk directly back to and enter the gold Chevy Blazer.

3. Detective David Boone followed the gold Chevy Blazer and conducted a traffic stop on the vehicle. Detective Boone made contactwith the driver and only occupant of the vehicle. The drive, Matthew Tidwell D.O.B. [ ]1983, stated to Detective Boone that he had just purchased heroin and told Detective Boone its location inside his vehicle. A search of the vehicle located a white balloon that contained approximately .7 grams of a brown tar substance that field tested positive for heroin, in the passenger side floorboard. Tidwell was mirandized and stated he understood. Tidwell then told Detective Boone that he had purchased the heroin from the occupants of the blue Nissan Xterra.

4. Surveillance was maintained on the blue Nissan Xterra. The vehicle was followed by detectives to the Kroger parking lot located at 5771 Nolensville Pike. A male white was observed by your affiant walking to and entering the back seat passenger side of the blue Nissan Xterra. The vehicle then left the parking lot westbound on Old Hickory Blvd. A traffic stop was conducted on the vehicle for failing to use his turn signal when turning right onto Hickory Plaza Drive. The driver of the vehicle was identified as Andres Mondragon Reyes. The front seat passenger of the vehicle was identified as Rogelio Ruiz Cordova. The blue Nissan Xterra bearing Tennessee license plate J6076B was shown to be registered to Luis Hernandez of 153 Ocala Drive Antioch, TN 37013. Andres Mondragon Reyes stated that he lives at 153 Ocala Drive. Andres Mondragon Reyes and Rogelio Ruiz Cordova were not found to be in possession of any illegal drugs and released.

. . . .

6. Items located in the trash were the following: five paper plates with a brown tar like substance, nine plastic baggies with a brown tar like substance, duct tape with plastic attached to the bottom with brown tar like substance, and seven balloons. A portion of the brown tar like substance from one of the paper plates was field tested. The substance field tested positive for heroin. Also located in the trash was one piece of misc paperwork/mail that was addressed to "Our Neighbor" and had the address of 153 Ocala Drive Antioch, TN 37013 listed on it. The listed items leads your affiant to believe that the trash with it's illegal contents were discarded from 153 Ocala Drive Antioch, Davidson County, Tennessee, 37013.

7. A check of NES record shows an active account in the name of Roberto O Ceja.

8. On 04/25/2013 your affiant went to 153 Ocala Drive and observed a grey Ford Mustang, bearing Tennessee License plate 710MMC, in the additional parking

area for the residence. A check of the registered owner of the vehicle shows Andres Mondragon Reyes with an address of 153 Ocala Drive Antioch, TN 37013.

9. Through your affiant's training and experience, I have learned that heroin is wrapped in plastic then wrapped inside a balloon for the purpose of selling it.

(Docket Entry No. 60-2).

April 26, 2013, Metro Police Department officers with the South Precinct Crime Suppression Unit executed a state search warrant for a house located at 153 Ocala Drive, Antioch, Tennessee. At the time the officers executed the warrant, Armando Morales and Raul Cedello-Pena were inside the residence. The officers' search of the residence revealed approximately 4 pounds of heroin that was packaged in numerous bags and balloons in a second floor closet in an upstairs bedroom. The lock on this closet door was a new brushed nickel entry lock, but the other door accessories were brass. A Lorcin 9mm pistol in plastic with a bleach like substance was also in this upstairs bedroom. On a table in this bedroom was heroin residue, scissors, and balloon trimmings at the table's legs.

As the officers searched, two persons, later identified as Josue Castro Pineda and Ines Lopez Pena, arrived at this residence in separate vehicles and parked. Pena, who drove a blue Infinity M3A, was searched, and officers found 2 grams of a white powdery substance that field tested positive for cocaine. Inside the Infinity vehicle, Officer William Mackall recovered a small piece of plastic wrapping that was underneath the rear driver's side door handle. This plastic had a brown residue that field tested positive as heroin. Pena's cell telephone had a text message, dated April 25, 2013, at 11:41:02 GMT-5, "Need 1 big one and I got 6gs for 3." The reply from Pena's cell telephone at 12:30:42 GMT-5 reads "can you come to ocala drive."

While Metro police officers were searching the house, Defendant Lopez arrived and was almost immediately arrested. Officers searched Defendant Lopez and found a small amount

(approximately .2 grams) of cocaine on his person. Officers searched his vehicle and found "residue" that later tested positive for heroin. Officers also found either on Defendant Lopez or in his vehicle a cellular telephone with text messages that the officers believed to be connected to drug trafficking. Defendant Lopez was questioned by Metro police officers at the scene, where he made at least two incriminating statements: (1) his admission that he "answered the phones taking orders for heroin for the organization for approximately three months;" and (2) that "he did not touch the drugs but only answered the phone." (Docket Entry No. 1, Criminal Complaint at 5).

Gene Davis, a Drug Enforcement Administration Task Force Officer, arrived at the residence during the search and determined that Armondo Morales, Raul Cedello Pena and Ines Lopez Pena understood some English and could read Spanish. Davis provided each with a Spanish version of written <u>Miranda</u> warnings and also advised each of his <u>Miranda</u> rights and questioned each in English.

In his questioning of Morales in English, Morales told Davis that he was the lease holder for the residence and rented rooms to other persons, including Raul Cedello Pena and Josue Castro Pineda. Morales denied knowledge of the heroin found inside this residence. Morales identified his bedroom as next to the bedroom where the heroin was found. Morales stated that he did not allow anyone in his bedroom. Morales told Davis that Josue Castro Pineda lived in the room where the heroin was found. Morales stated that Andres Mondragon Reyes also lived at the residence, but Reyes was not present at the time of the search.

Davis also questioned Raul Cedello Pena in English, and Raul Cedello Pena acknowledged his understanding of his <u>Miranda</u> rights. Raul Cedello Pena told Davis that for the last few weeks, he had distributed approximately 20 balloons of heroin that he received from Josue Castro Pineda.

Raul Cedello-Pena drove to locations to meet purchasers and collected money for the heroin that was $50 for each balloon. Raul Cedello Pena returned the monies to Josue Castro Pineda. who paid Raul Cedello Pena $400 per week for his role. Raul Cedello Pena also identified the room with heroin as Josue Castro Pineda's room. Raul Cedello Pena also told Davis that Armando Morales did not know about the drugs and that "Andres" also lived at the residence. Raul Cedello Pena's cellular telephones had text messages about heroin sales.

After acknowledging his understanding of his <u>Miranda</u> rights, Ines Lopez Pena told Davis that for approximately three months, he answered the telephones and took orders for heroin for the organization, but did not touch the drugs. Ines Lopez Pena refused to answer any further questions after he was told that he would not be released. A search of Ines Lopez Pena revealed a bag with a small amount of cocaine and a small cellophane bag with heroin residue. Both bags were field tested and tested positive for the respective substances.

Josue Castro Pineda acknowledged that he understood his rights, but refused to answer any questions. During a search of Josue Castro Pineda at the residence, officers located a key that unlocked the closet with the heroin. Josue Castro Pineda's cellular telephones also had text messages about heroin sales. The heroin recovered from the closet field tested positive for heroin. A total of 22 cellular phones were recovered at the Ocala residence and from the Defendants.

### B. Conclusions of Law

### 1. Standing

As a threshold issue, the Government challenges Defendant Ines Lopez's standing to challenge the search warrant for the Ocala residence because he did not reside at that residence. "The proponent of a motion to suppress has the burden of establishing that his own Fourth

Amendment rights were violated by the challenged search or seizure." Rakas v. Illinois, 439 U.S. 128, 132 n. 1 (1978). For this burden, a defendant must establish, on an objective and subjective basis, a reasonable expectation of privacy in the place searched. Minnesota v. Carter, 525 U.S. 83, 88 (1998). "[O]ne wrongfully on the premises could not move to suppress evidence obtained as a result of searching them[.] '[A]nyone legitimately on premises where a search occurs may challenge its legality.'" Rakas, 439 U. S. at 141 (footnote and citation omitted).

From a review of the proof, Ines Lopez lacks any cognizable privacy interest in the Ocala residence. Lopez did not testify that he lived in the Ocala residence. Lopez testified that he lived with his girl friend and has had landlords, but did not refer to Armando Morales as his landlord nor his girl friend as residing at the Ocala residence. Based upon this proof, the Court concludes that Ines Lopez lacks standing to challenge the search warrant for the Ocala residence.

The only arguable basis for standing is that Lopez was arrested after parking his vehicle at the Ocala residence. This area can be considered indicia of curtilage.

> "[W]hether the area immediately adjacent to the defendant's mobile home at 391 Barnard Narrows Road qualifies as curtilage of that residence. See United States v. Dunn, 480 U.S. 294, 301, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987) (noting that whether an area constitutes curtilage should be evaluated by weighing the factors of "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by").

United States v. Houston, No. 3:13–10–DCR, 2013 WL 3975591 at *7 (E. D. Tenn. July 30, 2013. Yet, a court's conclusion that an area is curtilage does not end the analysis, as "law enforcement officers are entitled to observe things in plain sight from publically accessible areas." United States v. Anderson–Bagshaw, 509 Fed.Appx. 396, 404 (6th Cir. 2012). Here, Lopez did not submit any proof that he had a reasonable expectation of privacy in the publicly visible area close to the Ocala

residence.

## 2. The Searches Incident to the Execution of the Search Warrant

As to Lopez's challenge to the search of his person, in Tindle v. Enochs, 420 Fed.Appx. 561 (6th Cir. 2011) the Sixth Circuit stated the applicable rule for the search of a person who arrived at a residence that was the subject of a police search pursuant to a search warrant, explaining

> [In] Michigan v. Summers, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) ... Detroit police officers were preparing to execute a search warrant on a house for narcotics when Summers exited down the front steps of the house. Id. at 693, 101 S.Ct. 2587. The officers asked Summers for help gaining entry into the house and "detained him while they searched the premises." Id. **After finding narcotics in the basement, they arrested Summers and, after a subsequent search, found heroin in his coat pocket. Id. Instead of determining that the officers had probable cause for the detention, the Supreme Court created an exception to the probable cause requirement holding,:**
>
> **If the evidence that a citizen's residence is harboring contraband is sufficient to persuade a judicial officer that an invasion of the citizen's privacy is justified, it is constitutionally reasonable to require that citizen to remain while officers of the law execute a valid warrant to search his home.**
>
> **Id. at 704–05, 101 S.Ct. 2587. This exception has since been extended to include residents and non-residents of a house subject to a search warrant that leave or arrive at or near the time of the search warrant's execution. See United States v. Bohannon, 225 F.3d 615, 616–18 (6th Cir.2000) (upholding pre-arrest detention of people arriving at a house subjected to the execution of a search warrant); United States v. Cochran, 939 F.2d 337, 339 (6th Cir.1991) (upholding pre-arrest detention of the owner of a house subject to a search warrant who departed by car from the house immediately before officers executed the search warrant).** Like the officers in Summers, Enochs reasonably believed that Tindle had left a house targeted by a search warrant, according to the reports she had received. See Summers, 452 U.S. 692, 101 S.Ct. 2587.

Id. at 563-64. Thus, with the search warrant, the Court concludes that the officers possessed the authority to search Lopez who was arriving at the Ocala residence and parked his vehicle at that residence. This conclusion is underscored that by the time of Lopez's arrival, the officers had found

8

drugs and guns at the residence.

As to Lopez's challenges as to the reliability of the informant and the staleness of the February drug transaction in support of the search warrant, in Illinois v. Gates, 462 U.S. 213 (1983), the Supreme Court adopted a totality of the circumstances test to determine whether an issuing magistrate was presented with sufficient facts for the probable cause determination to issue the search warrant. Id. at 238. "[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of criminal activity." Id. at 243 n.13. Once a warrant is issued, "the task of a reviewing court is not to conduct a de novo determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." Massachusetts v. Upton, 466 U.S. 727, 728 (1984).

In the Court's view, the results of the April 25th trash search for the Ocala residence revealing traces of drugs, standing alone, would be sufficient to establish probable cause. This trash pull revealed a brown substance that field tested positive for heroin, plastic bags and seven balloons. In addition, the state court judge had the officer's training and experience that heroin is often wrapped inside of plastic bags and then wrapped inside a balloon before selling. Moreover, given that the state court judge concluded that probable cause existed for the search warrant, under United States v. Leon, 468 U.S. 897 (1984), the good faith exception applies to justify the search of Lopez, as well as the seizure of the drugs and drug activities on his person. See United States v. Brown, 147 F.3d 477, 485 (6th Cir. 1998) (quoting Leon). The pat down of the defendant and the discovery of the cocaine from his person and the cell phone was authorized by law based upon the Defendant's arrival at the location where a search warrant was being executed. Upon finding drugs on the Defendant's person, officer's had probable cause to seize the Defendant's cell phone and to search

the vehicle that the Defendants drove to the residence. The search of the Defendant's vehicle and his person was also authorized by the valid search warrant issued in this matter.

### 3. Miranda Claims

Both Defendants' motions seek exclusion of their statements to the officers at the residence, citing their limited ability to speak and understand English that precluded a knowing and voluntary waivers of their Miranda rights.

Under the Fifth Amendment to the United States Constitution, a defendant in a criminal case cannot be compelled to be a witness against himself. Consistent with that right, in Miranda v. Arizona, 384 U.S. 436, 478-79 (1966), the Supreme Court held that a person in police custody must first be informed in clear and unequivocal terms that he has the right to remain silent, that he has a right to consult an attorney before any questioning and can cease the interrogation to request counsel, that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires, and that any statements made after these warnings can be used against him in a court of law. "Custodial interrogation" is "'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in a significant way.'" United States v. Salvo, 133 F.3d 943, 948 (6th Cir. 1988) (quoting Oregon v. Mathiason, 429 U.S. 492, 494 (1977)). Any waiver of Miranda rights must be voluntary, knowing, and intelligent. Miranda, 384 U.S. at 444.

"[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Colorado v. Connelly, 479 U.S. 157, 167 (1986). The three requirements for police coercion are: "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the

defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." United States v. Mahan, 190 F.3d 416, 422 (6th Cir. 1999) (citation omitted). "When a defendant claims that a confession was coerced, the government bears the burden of proving by a preponderance of the evidence that the confession was in fact voluntary." Mahan, 190 F.3d at 422 (citing United States v. Wrice, 954 F.2d 406, 410 (6th Cir. 1992)).

"[I]t is true that 'language difficulties may impair the ability of a person in custody to waive [his Miranda ] rights in a free and aware manner'". United States v. Al-Choran, 610 F.3d 945, 954 (6th Cir. 2010). (quoting United States v. Heredia–Fernandez, 756 F.2d 1412, 1415 (9th Cir.1985), Where the involuntary and knowing waiver challenge is based upon the defendant's limited English skills barrier, waiver has been found where the defendant receives Miranda warnings in a language that he understands. United States v. Alaouie, No. 90-1970, 945 F.2d 663, 1991 WL 144479, at *4 (6th Cir. Aug. 1, 1991) (unpublished). In Alaouie, the Sixth Circuit held that Alaouie, a Lebanese citizen with limited command of the English, knowingly and voluntarily waived his rights when the defendant stated that he understood his rights after his Miranda rights were read to him in English one time. Id. at *5. In United States v. Gonzales, 749 F.2d 1329, 1331, 1336 (9th Cir. 1984), the defendant spoke poor English, but was held to have knowingly and voluntarily waived his Miranda rights where the arresting officer read the defendant his Miranda rights and provided the defendant with a written statement of his Miranda rights in Spanish and English.

Here, Davis confirmed that each Defendant could read Spanish and provided each Defendant a copy of the Miranda warnings in Spanish to read. At the evidentiary hearing in this action, both Defendants testified that each was able to read the Spanish version of the Miranda rights and

understood key provisions. The officers did tell the Defendants the maximum penalties for their conduct and one of the Defendants stopped talking once informed that he would not be released from custody. The Court concludes that there is not any evidence of coercive activity by Davis or the Metro police officers. The Defendants cite that the Metro police officers were armed. When Defendant Lopez arrived at the Ocala residence, the Metro police officers had discovered drugs and guns at the Ocala residence. Thus, the officers had a legitimate basis to have their weapons drawn. There is not any evidence of intimidation, coercion or deception by Davis.

For these reasons, the Court concludes that Defendants Ines Lopez Pena's and Raul Cedello Pena's motions to suppress (Docket Entry Nos. 52 and 54) should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the 13th day of February, 2014.

WILLIAM J. HAYNES, JR.
Chief Judge
United States District Court